UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FERNANDO SILVA DE SOUZA, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil Action No. 14-13788-DJC |
| FANIA LUIZA NEGRI and JORGE NOBRE SINOURA, | ) ) ) ) | |
| Respondents. | ) ) ) | |

# MEMORANDUM AND ORDER

**CASPER, J.**                          December 19, 2014

## I. Introduction

Petitioner Fernando Silva de Souza ("de Souza" or "Petitioner") seeks an order from this Court for the return of his five-year-old son (herein referred to as "G.N.S.") to Brazil pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 22514 U.N.T.S. 89 (the "Hague Convention" or "Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.* (formerly 42 U.S.C. § 11601). Respondents Fania Luiza Negri ("Negri"), G.N.S.'s mother, and Jorge Nobre Sinoura ("Sinoura"), Negri's husband (collectively, "Respondents"), oppose de Souza's petition and G.N.S.'s return to Brazil under Articles 13 and 20 of the Convention. Upon consideration of the evidence admitted at a two-day hearing and the parties' post-hearing submissions, the Court GRANTS the petition for return.

## II. Procedural Background

On October 7, 2014, de Souza filed an emergency petition in this Court for the return of

his five-year-old son, G.N.S., to Brazil pursuant to the Hague Convention. D. 1. As relief, de Souza sought, among other things, "an Order directing the prompt return of GNS to his habitual residence of Brazil." Id. at 9. On October 31, 2014, Negri and Sinoura filed their answers, D. 23, 24, and Negri moved to stay the proceedings for a period of six months pending resolution of an asylum application Negri filed on behalf of G.N.S. on October 13, 2014. D. 25 at 11. The Court denied Negri's motion to stay on November 12, 2014. D. 29. Between November 14, 2014 and November 24, 2014, the Court conducted a two-day hearing on de Souza's petition where Respondents raised two defenses under Articles 13 and 20 of the Convention: (1) that there is a grave risk of physical or psychological harm to G.N.S. in the event that he is returned to Brazil; and (2) that returning G.N.S. to Brazil violates the fundamental principles of the United States with respect to the protection of human rights and fundamental freedoms. D. 30, 36.

## III. Findings of Fact

At the hearing, the Court heard testimony from de Souza, Neuza Odete Andre da Silva (de Souza's aunt) and the Respondents, Negri and Sinoura. The Court also admitted numerous exhibits in evidence, including affidavits from one of G.N.S's teachers, Vandreia Pimenta, Exh. 5, a health care worker, Maria Helena Nicoletti, who supervised the health of G.N.S. during monthly visits, Exh. 6, and Claudecir Tuni, a neighbor of de Souza's, Exh. 7. In light of the evidence presented to the Court, the Court makes the following findings of fact:

G.N.S. is the son of de Souza and Negri. D. 1 at 1. De Souza and Negri met in Águia Branca, Brazil, approximately seven years ago. Transcript of November 24, 2014, Day 2, Hearing ("11/24 T.") at 3. They never married, but lived together and were in a relationship when G.N.S. was born in Brazil on January 20, 2009. Exh. 3 (birth certificate); Transcript of

November 14, 2014, Day 1, Hearing ("11/14 T.") at 29; 11/24 T. at 4.  According to de Souza, de Souza and Negri separated when G.N.S. was nine months old.  11/14 T. at 28.

Negri testified that when the couple "really separated," G.N.S. was two years old.  11/24 T. at 11.  Negri testified that de Souza struck her when she was three months pregnant with G.N.S. and, from that point forward during their relationship, he was abusive toward her.  11/24 T. at 4-6.  Negri also claims that when G.N.S. was around three years old, she left the child in de Souza's care while she went to the pharmacy and that when she returned she noticed bumps and bruises on G.N.S.'s legs.  Id. at 9.  When she inquired about what happened, Negri claims that de Souza told her that it was her responsibility to take care of the child, not his, because he had no patience.  Id.  Negri also claims that de Souza became more aggressive toward her and that she called the police on one occasion.  Id. at 10.  According to her account, after the police returned de Souza to his house, a short time later he returned and assaulted her.  Id. at 10-11.  Negri also claims that the child, G.N.S., observed de Souza assaulting her.  Id. at 11.  Although she never filed for a protective order from de Souza in Brazil, id. at 14-15, in October 2014 she sought asylum here, see D. 25 at 11, on the basis of this abuse.  11/24 T. at 15-16.

Although there were never any proceeding regarding custody of G.N.S. when they separated, 11/14 T. at 29, at some point later, around the time that G.N.S. was four years old, Negri filed suit to get child support and de Souza was ordered to pay child support.  Id. at 41; 11/24 T. at 13.

De Souza still lives in Águia Branca.  11/14 T. at 30-31.  Negri lived in the same city, but in another district on the other side of the city.  11/14 T. at 40.  Although the exact contours of de Souza's and Negri's respective visitation of G.N.S. remains somewhat unclear, both parents, including de Souza, were playing a role in his care and upbringing.  Compare 11/14 T. at 26-27

3

(de Souza describing that G.N.S. lived with him primarily from 9 months old until Negri took him to the United States, approximately for four years time) with 11/14 T. at 27-28 (de Souza describing that Negri sometimes took G.N.S. on weekends and would "take him occasionally") and 11/14 T. at 55 (de Souza's aunt testifying that Negri would visit G.N.S. "sometimes once a week"); 11/24 T. at 14 (Negri testifying that G.N.S. lived with her since birth). While at de Souza's, G.N.S. lived with his father, his father's parents and two sisters. 11/14 T. at 26. While de Souza was working, de Souza's mother would take care of him and G.N.S. would be in the care of de Souza's aunt after school. Id. at 27, 49. De Souza denied hitting G.N.S. or ever physically disciplining the child. Id. at 27, 41. De Souza's aunt, who helped care for G.N.S., never observed any abuse or violence by de Souza. Id. at 52.

De Souza never gave Negri permission to remove G.N.S. from Brazil, 11/14 T. at 25, or to remove him under another name. 11/14 T. at 20-21. On or about December 11, 2013, Negri took G.N.S. afterschool one day and first went to another part of Brazil, Curitiba. 11/14 T. at 23-24, 34, 48, 52. Negri told de Souza's aunt, who would watch G.N.S. in the afternoons, that she would bring the child back within two hours, but she did not. Id. at 56. Although Negri later indicated that she intended to stay in Curitiba on a vacation with G.N.S., she had not communicated such intention to de Souza prior to their departure. Id. at 34-35, 42. Upon this discovery, de Souza contacted Child Services to find Negri and G.N.S. Id. at 23-24. When Child Services located her, Negri indicated that she would return to Águia Branca, but then never did so. Id. Negri's return was expected on January 24, 2014, but she did not return, and instead travelled to the United States. Id. at 24-25. De Souza never gave Negri permission to travel with G.N.S. to the United States or, once here, to remain here. Id. at 25. Once in the United States,

de Souza had limited contact with G.N.S., having spoken to him only two or three times since his arrival here. Id. at 25.

## IV. Conclusions of Law

In light of the findings of fact enumerated above, the Court makes the following conclusions of law.

### A. **Legal Framework**

"The Hague Convention is a multilateral treaty designed to address the problem of international child abductions during domestic disputes." Mauvais v. Herisse, 772 F.3d 6, 10 (1st Cir. 2014) (quoting Neergaard–Colón v. Neergaard, 752 F.3d 526, 529-30 (1st Cir. 2014)) (internal quotation marks omitted). The Convention aims to "secure the prompt return of children wrongfully removed to or retained in any Contracting State and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Charalambous v. Charalambous, 627 F.3d 462, 466 (1st Cir. 2010) (quoting Hague Convention, art. 1) (internal quotation marks omitted). "[O]rdering the return of a child does not alter the existing allocation of custody rights," but "allows the courts of the [child's] home country to decide what is in the child's best interests." Darin v. Olivero-Huffman, 746 F.3d 1, 8 (1st Cir. 2014) (second alteration in original) (internal quotation mark and citation omitted). Two important principles underlie the Hague Convention:

> First, a district court deciding a petition for return of a child has jurisdiction to decide the merits of the wrongful removal claim, but it may not decide the merits of the underlying custody dispute. Second, the Hague Convention is generally intended to restore the pre-removal status quo and to discourage a parent from engaging in international forum shopping.

Kufner v. Kufner, 519 F.3d 33, 38 (1st Cir. 2008) (citations omitted). As such, "[t]he Convention establishes a strong presumption favoring return of a wrongfully removed child." Charalambous, 627 F.3d at 466 (citation omitted).

To succeed on a petition for the return of a child under the Hague Convention, a petitioner must establish by a preponderance of the evidence that the child was "wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A); Hague Convention, art. 3. Removal or retention is wrongful when:

> (a) it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> (b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Kufner, 519 F.3d at 39 (omission in original) (quoting Hague Convention, art. 3). The Convention requires that children who have been "wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." See id. at 38; 22 U.S.C. § 9001(a)(4).

### B. *Prima Face* Case: Wrongful Retention and Removal

Accordingly, to establish a *prima face* case under the Convention, de Souza must prove by a preponderance of the evidence that G.N.S. "has been wrongfully removed and retained within the meaning of the convention." McManus v. McManus, 354 F. Supp. 2d 62, 66 (D. Mass. 2005) (citation omitted). This requires a showing that: (1) prior to removal and wrongful retention, G.N.S. was habitually residing in Brazil; (2) G.N.S.'s removal and retention was in breach of Brazilian custody laws; and (3) de Souza was exercising his custody rights at the time of the removal and wrongful retention. See e.g., Mlynarski v. Pawezka, 931 F. Supp. 2d 277, 283 (D. Mass. 2013) ("A child is considered 'wrongfully removed' when the removal is 'in

6

breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal' and 'at the time of removal . . . those rights were actually exercised[1] . . . or would have been so exercised but for the removal'") (omission in original) (quoting Hague Convention, art. 3(a)-(b)).

To determine if G.N.S.'s place of habitual residence is Brazil, the Court "must consider the parents shared intentions regarding their child's residence and look for a degree of settled purpose from the child's perspective." Id. It is largely undisputed that G.N.S.'s place of habitual residence is Brazil. The child was born in Brazil and both his parents, who have custody of him, lived there in separate districts in Águia Branca until Negri brought him to this country.

Moreover, G.N.S.'s removal from his habitual residence, without the consent of his father, de Souza, is in violation of de Souza's custody rights. Although Negri disputes the nature and positive value of de Souza's time with and care of G.N.S., there is no serious dispute that both parents, Negri and de Souza have custodial rights over G.N.S. Exh. 2.

Finally, on the present record, the Court finds that de Souza was exercising his custodial rights at the time that Negri removed their child from Brazil. The Court credits the testimony that de Souza gave no consent to G.N.S.'s removal and that de Souza was exercising his custodial rights as evidenced by his regular care of the child in Brazil (including the provision of care that was being provided by his aunt after school for G.N.S. on the day in December 2013 when Negri took G.N.S. to another part of Brazil and, thereafter, left with the child for Brazil). See generally 11/14 T. at 22-23; Exh. 1; Exh. 5 at ¶¶ 6-7 (G.N.S.'s teacher attesting that de Souza attended various school events for G.N.S.); Exh. 6 at ¶ 5 (health care worker attesting that

---

[1] "[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." In re S.L.C., No. 14-CV-88-FTM-29CM, 2014 WL 2801053, at *7 (M.D. Fla. June 19, 2014).

"G.N.S. lived with his father"). The Court also credits de Souza's testimony that he did not give consent to Negri to remove G.N.S. from Brazil to the United States. 11/14 T. at 23. This lack of consent is corroborated by the nature of Negri's removal of the child, without advance notice to de Souza, and also by the fact that Negri traveled to the U.S. with G.N.S. under a passport that was not in his name. Exh. 4; 11/24 T. at 24.

Accordingly, the Court finds that de Souza has shown, by a preponderance of the evidence, that Negri's removal of G.N.S. from Brazil was wrongful.

### C. **Affirmative Defenses**

Having concluded that de Souza has satisfied his showing, the Court shall turn to whether Respondents have satisfied their burden as to either of the defenses that they have raised.

#### *1. Burden of Proof as to Defenses*

Respondents have raised two of the "exceptions to th[e] [Convention's] general rule" of return. Walsh v. Walsh, 221 F.3d 204, 216 (1st Cir. 2000). A child wrongfully retained or removed need not be returned if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). In addition, the Court may also refuse to order the return of the child if the child's return "would not be permitted by the fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20.

"The Convention establishes a strong presumption favoring return of a wrongfully removed child" and thus "[e]xceptions to the general rule of expedient return . . . are to be construed narrowly." Danaipour v. McLarey, 286 F.3d 1, 13–14 (1st Cir. 2002). The Court "retain[s] the discretion to order return even if one of the exceptions is proven." Feder v. Evans-

Feder, 63 F.3d 217, 226 (3d Cir. 1995); accord Danaipour, 286 F.3d at 14 (noting that "even if the conditions for an Article 13(b) exception are met, the Hague Convention gives the court discretion to return the child to the country of habitual residence"); de Silva v. Pitts, 481 F.3d 1279, 1285 (10th Cir. 2007) (noting that "even if a defense is established, a court still has discretion to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child").

a) Grave Risk of Harm

"The bar for proving the 'grave risk' exception is set exceptionally high." Krefter v. Wills, 623 F. Supp. 2d 125, 135 (D. Mass. 2009). A respondent who opposes the return of the child by asserting the "grave risk" exception under Article 13(b) has the burden of proving this defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). Subsidiary facts may be proved by a preponderance of the evidence. Id. The clear and convincing standard "leaves no substantial doubt . . . [i]t is proof that establishes . . . not only that the proposition at issue is probable, but also that it is highly probable." Danaipour v. McLarey, 183 F. Supp. 2d 311, 315 (D. Mass. 2002) rev'd on other grounds, 286 F.3d 1 (1st Cir. 2002) (omissions in original). To meet their burden, Negri and Sinoura must show that, if G.N.S. is returned, the risk of physical or psychological harm is "grave," which is "a great deal more than minimal," Walsh, 221 F.3d at 218, and "means a more than serious risk." Danaipour, 286 F.3d at 14. "Not any harm will do nor may the level of risk of harm be low." Walsh, 221 F.3d at 218. "The Convention does not require that the risk be 'immediate'; only that it be grave." Id.

The First Circuit has cautioned that the "Article 13(b) defense may not be used 'as a vehicle to litigate (or relitigate) the child's best interests.'" Danaipour, 286 F.3d at 14 (quoting

9

Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)). "Courts are not to engage in a custody determination," Walsh, 221 F.3d at 218, and "[t]hus, in determining whether the petition for return ought to be granted, the task is not simply to determine where the child would be happiest or who would be the better parent." McManus, 354 F. Supp. at 69; see also Whallon v. Lynn, 230 F.3d 450, 459 (1st Cir. 2000) (noting that courts are not to "address such questions as who would be the better parent in the long run"). Nor is it relevant "whether [the absconding parent] had good reason to leave her home . . . and terminate her marriage." Mauvais, 772 F.3d at 15 (alteration in original) (citations omitted).

### b) Human Rights and Fundamental Freedoms

A court may to refuse to return a child if doing so would violate fundamental principles relating to the protection of human rights and fundamental freedoms. Hague Convention, art. 20. This exception must also be proven by clear and convincing evidence. Danaipour, 183 F. Supp. 2d at 315 (rev'd on other grounds). Article 20 is rarely invoked and is "meant to be restrictively interpreted and applied . . . on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." Hazbun Escaf v. Rodriquez, 200 F. Supp. 2d 603, 614 (E.D. Va. 2002) (omission in original) (quoting State Department Legal Analysis at 10,510) (internal quotation mark omitted). In large measure, Article 20 and Article 13(b) are considered redundant because "[i]f the return of a child would violate fundamental U.S. principles relating to human rights, it would also involve returning him to an intolerable situation." Id. at 614, n.37.

### 2. *Respondents Have Not Satisfied Their Burden*

The Court finds that Respondents have not satisfied their burden of proving, by clear and convincing evidence, either an Article 13 or 20 defense. Addressing the issue of grave risk of harm, the Court concludes that the Respondents have failed to show credible evidence that G.N.S. is in grave risk of harm if he is returned to Brazil. The only proffered evidence offered regarding any risk of harm to G.N.S. was the testimony of Negri, his mother and one of the Respondents. She alleges that G.N.S. observed de Souza's abuse of her and that, on one occasion, when he was a few months old, she returned to find G.N.S. with bruises and bumps and that de Souza had expressed frustration with caring for the child in her absence. 11/24 T. at 9. She has no corroboration of this allegation. Sinoura testified that he had observed bruises on G.N.S., but did not provide a time frame for these observations and noted that he did not know how these bruises got there. 11/24 T. at 35. If Negri's allegations of her abuse by de Souza are to be credited, fear might have prompted her not to contact law enforcement authorities. See 11/24 T. at 6 (Negri testifying that she was fearful of de Souza); 11/24 T. at 32, 34 (Sinoura testifying that he observed bruises and small scratches on Negri and reporting that de Souza threatened the Respondents). It does not, however, explain why there was no proffer of such record for the one incident in which she alleged that she did in fact call the police, 11/24 T. at 10, or any medical evidence to corroborate any contemporaneous injuries.

Moreover, as to grave risk to G.N.S., which as First Circuit precedence directs, Charalambous, 627 F.3d at 468 (holding that "[t]he relevant inquiry is not whether there would be a grave risk of harm to [partner] if she returned to [country of habitual residence]; rather the grave risk inquiry goes to the child[]" and respondent must "draw a connection establishing, by clear and convincing evidence, that any risk to [partner] constituted a grave risk to the child[]"),

11

must be the Court's focus here, there was credible and unrebutted evidence suggesting that G.N.S. has shown no signs of abuse. For instance, a health care worker, charged with checking in on children and the elderly, who visited G.N.S. on a monthly basis, "never witnessed any bruising or other signs of abuse on [G.N.S.]." Exh. 6 at ¶ 6; see 11/24 T. at 26 (describing health care worker's role). G.N.S.'s teacher for two years from 2012-2013 also attested that she "never witnessed any bruising or other signs of abuse on [G.N.S.]," who attended school each weekday. Exh. 5 at ¶¶ 4-5. A neighbor of de Souza's, who has lived next door to the Petitioner and G.N.S. and often visited their residence, "never witnessed any bruising or other signs of abuse" on the child. Exh. 7 at ¶¶ 4, 6. Whatever the state of de Souza and Negri's relationship may have become, Respondents have not shown that G.N.S., who spent a fair amount of time in the custody of de Souza and de Souza's relatives before his removal from Brazil, is in grave risk of harm. The Respondents have failed to meet the exceptionally high burden that they must meet as to this defense.[2]

Similarly, the Respondents have failed to meet their burden of proving an Article 20 defense that returning G.N.S. to Brazil would violate fundamental principles relating to the

---

[2] De Souza has moved to strike portions Respondents' post-hearing brief, D. 38, that paraphrase an October 16, 2014 affidavit of Respondent Negri, as well as the affidavit itself, which was attached to Respondents' post-hearing brief as an exhibit. D. 39. Negri testified at the hearing, and while the affidavit was referenced during Negri's testimony, the affidavit was not introduced or admitted into evidence. 11/24 T. at 15-18. At the close of evidence, the Court allowed counsel the opportunity for post-hearing briefing, but stated explicitly that the record was closed. 11/24 T. at 43-44 (noting that "[t]he record itself is closed, but to the extent that you want to add anything to your legal arguments . . . you can feel free to do that"). Accordingly, the Court agrees with de Souza that Respondents are now barred from relying on the affidavit when it was not introduced prior to the close of evidence. See e.g., F.T.C. v. Direct Mktg. Concepts, Inc., 648 F. Supp. 2d 202, 212 (D. Mass. 2009) (striking an exhibit attached to post trial brief where it was "not admitted at trial"); In re Shanahan, No. 11-42388-MSH, 2013 WL 3216131, at *1, n.3 (Bankr. D. Mass. June 25, 2013) (reviewing parties' post-trial statements "in light of the evidence introduced at trial" and ignoring "any parts of each statement not supported by the evidence"). For the foregoing reasons, the Court ALLOWS Petitioner de Souza's motion to strike, D. 39.

protection of human rights and fundamental freedoms. This defense requires a similarly high burden, which is appropriate here where the Article 20 proffer arises out of the same nucleus of facts (i.e., that it would be inhumane to return G.N.S. where he has been subject to abuse by de Souza and witness to abuse of his mother by de Souza). For all of the reasons discussed above as to the grave risk of harm defense under Article 13, the Court concludes that the Respondents have failed to show, by clear and convincing evidence, that this record supports a Article 20 defense. Moreover, although Negri has filed for asylum here on largely the same basis, (i.e., alleged abuse by de Souza), she did so, not when she first arrived in the United States with G.N.S. in January 2014, but soon after de Souza initiated this Hague Convention case. See D. 25 at 11. The Court finds no more support for this defense than that discussed in regard to the grave risk of harm defense.

**V.      Costs, Fees and Transportation Expenses Related to the Return of G.N.S.**

De Souza has requested an order requiring the Respondents to pay court costs, fees and transportation expenses related to the return of G.N.S. D. 37 at 9. The ICARA provides, in pertinent part:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3). Here, the Petitioner has prevailed and, therefore, the prerequisite for an award has been established. Thus, "[a]n award of the enumerated costs and fees is made mandatory by the plain language of the statute." Hasan v. Hasan, No. 03-11960-GAO, 2004 WL 57073, at *4 (D. Mass. Jan. 13, 2004). Nevertheless, "[t]wo issues remain: first, whether the claimed expenses [are] 'necessary,' and second, whether an order against respondent would be

13

'clearly inappropriate.'" Whallon v. Lynn, No. 00-11009-RWZ, 2003 WL 1906174, at *2 (D. Mass. Apr. 18, 2003) (quoting 22 U.S.C. § 9007(b)(3)).  Accordingly, Petitioner has until January 16, 2015 to file a motion enumerating what he alleges are "necessary" expenses, including court costs, fees and transportation expenses.  Respondent will have until January 30, 2015 to respond to the motion and address whether any such award would be "clearly inappropriate."  See 22 U.S.C. § 9007(b)(3).

## VI. Conclusion

For the foregoing reasons, the Court GRANTS the petition for the return of G.N.S. to Brazil.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge